[No. 1498.]

## PRYOR HOLDER *v.* THE STATE.

1. CONTINUANCE—DILIGENCE—PRACTICE.—The record discloses that an indictment against the defendant for theft was filed on the ninth day of February, 1883, that he was committed to jail the same day, and that he was assigned counsel on the twelfth day of the same month. The defendant alleged in his application for a continuance that, "as soon as he could confer with his counsel, he procured the issuance of an attachment, returnable *instanter*, for this and other witnesses, which has not been returned." *Held*, a sufficient showing of diligence.

2. SAME—EVIDENCE—NEW TRIAL.—See the opinion *in extenso* for evidence set out in an application for a continuance, held, in view of the evidence adduced, material to the defense and unobjectionable when viewed as to the probability of its truth; wherefore, the continuance having been erroneously refused, a new trial should have been granted.

3. THEFT—EVIDENCE—NEW TRIAL.—See a state of proof in a theft case, on which a new trial should have been granted because the verdict was not supported by the evidence.

APPEAL from the District Court of Delta. Tried below before E. B. Perkins, Esq., Special Judge.

The indictment was joint against the appellant and John Burton. It charged them with the theft of a horse, the property of W. W. Ivie, in Delta county, Texas, on the twenty-seventh day of December, 1882. Being alone upon his trial, the appellant was convicted, and was awarded a term of five years in the penitentiary.

The first witness introduced by the State was W. W. Ivie. He testified in substance that he lived, and had lived for a year at the time of this theft, in Delta county near Cooper, and on the road leading from that town to Paris, in Lamar county. He had known the defendant for some time, and had him employed during the fall of 1882, picking cotton. The defendant was perfectly familiar with the witness's place, and everything about it. The witness did not know John Burton, and had never seen him, to his knowledge.

On the morning of the twenty-seventh of December, 1882, the witness left his home to go to Greenville in Hunt county, and

returned home on the evening of the next day. During the absence of the witness, his wife, Mrs. A. E. Ivie, was left in charge of his home place and property. He left, in his lot, two mares, and also a sorrel horse fourteen and a half hands, high, four years old in the spring of 1883. The sorrel horse had some white on his forehead, running three or four inches down his face towards his nose. He had been running in the thicket, and had become so infested with ticks that his skin was quite lumpy. The witness left this horse in his lot on the morning of December 27, 1882, and it was missing when the witness returned home on the next evening. The witness made diligent search throughout his range, but has never seen the sorrel horse since. The horse was the property of the witness, and the witness had never given his consent to any one to take him. The man Burton knew nothing of the witness's premises.

Some time after the theft of the horse, and while the defendant was on bail, and not in custody, the witness had a conversation with him about the horse. The defendant told the witness that he thought he knew where the horse was; that he was at Pierce's, east from Cooper, and that he, the defendant, would get the horse for the witness for twenty-five dollars, which the witness agreed to pay. The defendant did not get the horse for the witness. The defendant had been living across a neighboring creek, about a half of a mile distant from the witness's house. On the day the theft is alleged to have been committed, he moved from that place to the Pickett place, about two and a half miles east. The defendant owned at the time but one animal of the horse kind, an old gray mare. The defendant was arrested for this offense, on a warrant from the county court, on the sixth or seventh instant. (This trial was had on February 14, 1883.) He gave bond, and it was while he was on bail that the witness had the conversation with him referred to.

Mrs. A. E. Ivie was the next witness to testify for the State. Her narrative was to the effect that when Mr. Ivie left home on the morning of December 27, 1882, she turned the horses out of the lot. They returned just at nightfall, and the witness turned them in and fed them. One of the animals, a brown mare, she locked in the stable. The remaining two horses, including the one stolen, she left loose in the lot, after fixing up the fence and closing and pinning the gate from the outside. No one passed the house that night after the witness put the horses up.

When the witness got up next morning, the brown mare was

in the stable, the black mare was in the lot, but the sorrel horse was gone. The gate, which opened outward, was standing open wide enough to allow a horse to pass through, and the gate pin was lying inside of the lot, about three feet from the gate. The witness did not know what became of the sorrel horse. She has never seen him since. She did not give her consent to any one to take him. This witness knew the defendant, but she did not know Burton.

The substance of the testimony of John Williams, the third witness for the State, is set out in the opinion.

Mrs. Susan Hobson testified, for the State, that she lived on the Pickett place, about one and a half miles east from where the defendant lived up to December 27, 1882. On that day the defendant moved into the same house with the witness and her husband. He finished moving about nine o'clock on that morning. The witness, her husband and the defendant ate dinner that day at Mr. Strawn's, who lived about one and a half miles distant, and the witness returned home shortly after dinner. About three o'clock that evening, the defendant and a man who was a stranger to the witness, but who passed under the name of Burton, came to the house. Burton was riding a spotted or paint pony, and the defendant was walking. They went into the house, and spent some little time talking together. Burton got a pair of boots from the defendant, and went out and mounted the paint pony. He then called the defendant to the gate, and they conversed for some fifteen minutes. Burton then rode the paint pony off towards Strawn's, and the witness had not seen him since.

Soon after Burton left, the defendant left the premises on foot, going in the direction of Ivie's. He returned that night about eight or nine o'clock, and the witness's husband, Ben Hobson, returned fifteen minutes later. The defendant put the only horse he had, an old gray mare, in the Pickett pasture on Tuesday, December 26, 1882, and she remained in there until late next evening, when she was ridden to Strawn's by a little boy who went to get some meal. The boy returned about sundown, and again turned the mare into the same pasture, where she remained all of the night of Wednesday, December 27, 1882. The defendant knew, all of the time, that the gray mare was in the Pickett pasture. The witness heard the defendant say, a short time later in Ben Hobson's presence, that he was not at all uneasy about the paint pony Burton rode; that he would get either

the pony or pay for it, though ten years might elapse first. The defendant also said in this conversation that Burton would not have taken Ivie's sorrel horse, but would have taken the valuable brown mare, which was tied in the stable that night. The defendant was not under arrest at the time he made these statements.

Ben. Hobson, the husband of the last witness, next testified for the State. The defendant moved to his home on the Pickett place about nine o'clock on the morning of December 27, 1882. The witness and his wife went to Strawn's that morning, and shortly the defendant, walking, and a stranger named Burton riding a paint horse, came to Strawn's. Just after dinner Burton sold the paint pony to the defendant, receiving in payment five dollars and a half in cash, and the defendant's note for twelve dollars and a half. The witness and Strawn endorsed the note as security, upon the request of the defendant, telling Burton at the time that their endorsement in point of law was valueless, as both were execution proof. Burton said that it made no difference; that the defendant's word was enough for him. This paint pony was worth forty or forty-five dollars. The defendant and Burton then left, going towards the Pickett place, where, they said, the defendant was to get his gray mare and go with Burton to Buford's bridge, and bring the paint pony back. A short time before night Burton returned to Strawn's, riding the paint pony. He came from the direction of the witness's house. Just before sundown he again left Strawn's, going towards Ivie's, saying that he was going to Cooper to gamble. As the witness was leaving Strawn's that night, between eight and nine o'clock, he met Burton going into Strawn's house alone. He told the witness that he had been walking and was very cold, and passed into the house. The witness walked around the corner of the house, and found the paint horse under saddle, and another horse secured to something. He examined the last named horse, thinking he might be the Pickett horse of which he, the witness, had charge. This horse he did not know, nor did he know Ivie's sorrel horse. The animal with the paint pony was a sorrel pony, about fourteen or fifteen hands high. It had some ticks on its body, and its hide was very rough. It had some white in the forehead, extending three or four inches towards the nose.

The witness called Strawn to the end of the house, and while he was telling Strawn about the horses Burton came out of the

house, mounted one of the horses, and rode off leading the other. The witness and Strawn called to him to wait, and proposed to go with him. He answered "come on," but did not stop. The witness had not seen him since. There were some clouds that night; the moon had not yet risen. It was not so dark, however, that the witness could not tell the color of the horses. The witness went home immediately, and went into the field to see about his horses. He found the defendant's old gray mare in the field. The defendant was at home. Some time afterwards the defendant said, in the presence of the witness and his wife, that he was not uneasy about the paint pony; that Burton would either bring it back or pay for it, though it might be ten years first. The witness had charged that Burton had taken the Ivie sorrel horse, and in this same conversation the defendant said that he, Burton, would not have taken the sorrel horse, but would have taken the brown mare out of the stable.

Nathan Holder, for the defense, testified as follows:

"The defendant is my brother, and John Burton is my brother-in-law. We were all raised up boys together. Since Ivie's horse was stolen, I have seen Burton at my house in Lamar county, and he there told me that he got Ivie's horse."

Jack Strawn, for the defense, testified concerning the visits of the defendant and Burton to his house, very much as the witness Ben. Hobson. He stated, however, that Burton got off with the horses before he, the witness, could examine them. He had not seen Burton since. He did not estimate the value of the paint pony over twenty-five dollars.

New trial was asked because:

1. The court erred in refusing the defendant's application for a continuance.

2. The court erred in its general charge to the jury.

3. The verdict is contrary to and without evidence.

4. The verdict is contrary to the law as charged by the court.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, J. The appellant was convicted of the theft of a horse, the property of W. W. Ivie.

The theory of the prosecution is, that Holder and one John

Burton stole the horse. In support of this theory, the State proved, by John Williams, that, on the twenty-seventh day of December, 1882, about dark (the same being the night on which the horse was taken), the defendant Holder and one other man were seen on the roadside in the creek bottom, about two hundred and fifty yards from Ivie's house; that they were not in the road, nor were they traveling; that it was too dark for the witness to see the features of the men. The witness spoke to them. Holder spoke, and was recognized by the witness. Being asked by the witness if he had moved that day, Holder answered "Yes;" and, in answer to the question what he was doing there in the bottom at that time of the night, he said that he was hunting for his old gray mare. * * * * * The witness did not know the other man, "but he was about Holder's size." * * * "He (the other man) did not speak while the witness was there."

The appellant moved for a continuance for the want of the testimony of several witnesses. By Bud Henderson, if present, appellant swore that he expected to prove that he, Henderson, was the man that was with the defendant on the night the horse is alleged to have been taken, when John Williams, the State's witness, met them in the bottom near Ivie's; and that said Bud Henderson traveled with the defendant some distance beyond Ivie's, and that the defendant did not have Ivie's horse in his possession at that time; and, further, that John Burton was not with him, the defendant.

The indictment was filed on the ninth day of February, 1883. The appellant was arrested and placed in jail on the same day. On the twelfth day of the same month, counsel was appointed by the court to defend the defendant. In his motion for continuance, he states that as soon "as he could confer with his counsel, he procured the issuance of an attachment, returnable *instanter*, for this and other witnesses, which has not been returned."

Was the above a good and sufficient showing touching the diligence used to procure the attendance of the witnesses? We are of the opinion that it was. Is the evidence of Henderson material and probably true? There is no evidence in the record tending to criminate the appellant with anything like the strength and cogency of that of the witness Williams; hence, the testimony of Henderson is not only material, but is of the first importance to the defendant. Is it probably true? There

is no conflict in the evidence of Henderson and that of Williams. The testimony of Henderson meets and neutralizes some of the inferences which were, no doubt, drawn from the facts related by Williams. But, suppose that there was a direct conflict in the testimony of these witnesses, should we hold, therefore, that the expected evidence of the absent witness was not probably true? To do so, would be to assume the province of the jury, and to decide at the threshold who was or who was not worthy of credit, there being but two witnesses. We will not extend this subject further, as there is no conflict in the evidence of these witnesses.

We are of the opinion that the court should have continued the cause, and erred in overruling the defendant's motion for a new trial, based upon this ruling on the motion to continue.

We are also of the opinion that the evidence does not support the verdict. But, as the cause will be remanded for another trial, we will not discuss the facts.

For the error of the court in not granting a new trial, based upon the erroneous action of the court in overruling the motion for continuance, and because the court erred in not granting a new trial upon the ground that the verdict is not supported by the evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered March 17, 1883.